**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

DAYNE Q. NOSSE,            )
                                   )
         Plaintiff,        )
                                   )     Civil Action No.: 08-cv-1173
        v.               )
                                   )
MICHAEL J. ASTRUE,      )
Commissioner of Social Security,  )
                                 )
         Defendant.     )

MEMORANDUM ORDER

<u>CONTI</u>, District Judge.

Pending before this court  is an appeal from the final decision of the Commissioner of

Social Security ("Commissioner" or "defendant") denying the claims of Dayne Q. Nosse

("plaintiff") for supplemental security income ("SSI") under Title XVI of the Social Security Act

("SSA"), 42 U.S.C. §§ 1381-83, and disability insurance benefits ("DIB") under Title II of the

SSA, 42 U.S.C. §§ 401-33.  Plaintiff asserts that the decision of the administrative law judge (the

"ALJ") should be reversed because the decision is not supported by substantial evidence.

Defendant asserts that the decision of the ALJ is supported by substantial evidence.  The parties

filed cross-motions for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil

Procedure.  The court will deny plaintiff's motion and defendant's motion, and will remand the

case for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Procedural History*

Plaintiff originally applied for benefits on February 24, 2000, on the basis of depression, panic attacks, migraines, pylonephritis, kidney stones, low back pain, and endometriosis.[1]  (R. at 28, 50-52.)  On August 29, 2000, plaintiff's claim was denied.  (R. at 28-32.)  Plaintiff did not appeal this denial.[2]  On December 5, 2003,[3] plaintiff filed a second application for DIB and SSI. (R. at 54-56, 897-99.)  These claims were denied on April 21, 2004.  (R. at 12, 33-37, 901-05.) On June 18, 2004, plaintiff filed a timely request for a hearing.  (R. at 12, 38.)  The hearing began on November 9, 2005, but the ALJ postponed it until March 20, 2006, to allow plaintiff's attorney an opportunity to submit a statement detailing any additional work performed during the period in which plaintiff alleges disability.  (R. at 12.)  Plaintiff's attorney did not submit an additional statement.  (Id.)  On June 28, 2006, the ALJ issued a decision finding that plaintiff was not disabled and could perform past work.  (R. at 17.)  Plaintiff requested a review of the ALJ's

---

[1]  Pyelonephritis is inflammation of the kidney and renal pelvis, typically from a bacterial infection.  *Taber's Cyclopedic Medical Dictionary* 1826 (Donald Venes, M.D., M.S.J., et al. eds., F.A. Davis Co. 2005).  Endometriosis occurs when endometrial glands (the glands lining the uterus) appear outside the uterine cavity.  *Id.* at 703-04.  Dysmenorrhea with pelvic pain is one of the common complaints in patients with endometriosis.  *Id.* at 704.  Dysmenorrhea means pain related to menstruation.  *Id.* at 650.

[2]  Because plaintiff did not seek reconsideration of this initial determination, the Commissioner's decision that plaintiff was not disabled prior to August 29, 2000, is administratively final.  20 C.F.R. §§ 404.905, 404.987.  Any medical evidence before this period is considered merely as background information.  Plaintiff  met the insured status requirements of the Social Security Act through June 30, 2005, and needs to show she was disabled after August 29, 2000, and before July 1, 2005, in order to obtain DIB.  (R. at 12, 14.)

[3]  The parties and the ALJ note the date plaintiff filed the second application was October 27, 2003.  The record (R. at 57, 897) reflects the date was December 5, 2003.

2

decision by the Appeals Council on August 31, 2006, which was denied on June 20, 2008. (R. 6-9.)  Plaintiff timely filed the instant lawsuit requesting judicial review.

### *Plaintiff's Background, Medical History and Mental Health History*

#### *A. Background*

Plaintiff was born on January 4, 1973, and was thirty-three years old at the time the ALJ issued the unfavorable decision.  (R. at 911.)  Plaintiff attended college at West Virginia University for four years until 1999, but did not complete her bachelor's degree due to health problems.  (R. at 70, 104, 309, 312, 912.)

Since plaintiff's alleged onset of disability on October 15, 1999, until her full hearing before the ALJ, plaintiff performed several jobs, mainly in the areas of retail and childcare.  (R. at 60-61, 453, 500, 857, 863, 873, 914-17.)  During 1999, plaintiff worked as a sales associate for Boscov's and American Eagle, as well as a bartender at RMC Holdings (the "Church").  (R. at 60-61, 153, 914, 916.)  She worked the longest as a sales associate at the GAP, where she worked from 1991-1996 and 2000-2001.  (R. at 58-60, 916.)  In 2000 she worked at the GAP about thirty-five hours per week.  (R. at 736.)  From 2003-2004 plaintiff worked as a sales associate at Bon-Ton Stores.  (R. at 61, 136, 916.)  Between 2002 and 2005 she also occasionally performed federally unreported work, mainly consisting of babysitting.  (R. at 453-57, 465, 490, 500, 504, 670, 835, 860, 867, 882-83, 915-16.)  In July 2003 she worked as a nanny for three children for four to five days a week for nine hours a day.  (R. at 453.)   Between 2004 and 2005 she cared for her grandmother, who has Alzheimer's disease, and babysat for fifty to sixty-five hours per week.

(R. at 871, 878, 880-81.)  On one occasion in late 1999, she was fired for missing work due to health reasons.  (R. at 129, 312, 333.)

### B.  *Medical History*

### 1) *Dr. Thuy Bui's Records*

From October 1999 until October 2005, plaintiff's primary care provider was Thuy Bui, M.D.  (R. at 288, 292, 834.)  In October 1999, plaintiff's medical history included a kidney stone, asthma, migraines, peptic ulcer disease from nonsteroidal anti-inflammatory medications, irritable bowel syndrome, and endometriosis.  (R. at 287-88.)

Throughout 2000, Dr. Bui saw plaintiff on fourteen occasions and diagnosed her with several different ailments.  (R. at 724-60, 273-80.)  She commonly diagnosed plaintiff with migraines and headaches, pyelonephritis, hypovolemia,[4] dysmenorrhea, urinary tract infections, and nausea with vomiting.  (R. at 724-60, 273-80.)  Plaintiff had an episode of bronchitis in October 2000. (R. at 733-35.)  In 2000, the laboratory results confirmed some of the common diagnoses, including urinary tract infections, dsymenorrhea, and hypovolemia.  (R. at 782-95.)

Plaintiff's primary diagnoses in 2001 included abdominal pain, migraines and headaches, nausea with vomiting, acute bronchitis, edema,[5] urinary tract infections, depression, and fever. (R. at 685-723.)  Other diagnoses included urinary frequency, insomnia, dermatitis, anxiety, and

---

[4]  Hypovolemia is "a decreased blood volume that may be cause by internal or external bleeding, fluid losses, or inadequate uptake of vitamins from the diet." *Taber's Cyclopedic Medical Dictionary*, *supra* n.1, at 1057.

[5]  Edema occurs when the body tissues contain an excessive amount of tissue fluid.  *Taber's Cyclopedic Medical Dictionary*, *supra* n.1, at 665.

acute sinusitis.  (R. at 685-87, 691-94, 698-700, 707-08, 716-18.)[6]  In 2001, plaintiff had seven

laboratory tests performed, which showed abnormal weight gain, urinary frequency, fever and

abdominal pain, edema (twice), a urinary tract infection, and nausea with vomiting.  (R. at 770-

81.)

    In 2002, plaintiff made eight visits to Dr. Bui's department,[7] with the common diagnoses

being abdominal pain and constipation.  (R. at 667-84.)  She also experienced vomiting,

noninfectious gastroenteritis, asthma, acute bronchitis, premenstrual tension, edema, benign

hypertensive renal disease without renal failure, myalgia and myositis, endometriosis, dermatitis,

and a foot infection.[8]  (R. at 669-84.)  The only laboratory test in 2002 supported a diagnosis of

abdominal pain epigastric and vomiting.  (R. at 767-69.)

    Plaintiff visited Dr. Bui's department three times in 2003, with diagnoses of abdominal

pain, infectious otitis externa, other atopic dermatitis, and opioid dependence-contin.  (R. at 657-

66.)  In her last visit on October 7, 2003, Dr. Bui noted that plaintiff still had "intermittent

---

[6]  Of the thirteen visits plaintiff made to UPMC's Montefiore's general medicine department in 2001, four were with Dr. Bui. (*See* R. at 685-723.)  The other visits were with Peter Bulova, M.D., Mary Buss, Kendal Williams, M.D., and Karen Barnard, M.D.  (R. at 691-94, 698-706, 709-18, 721-23.)

[7]  Plaintiff saw Dr. Bui on three of these visits, David J. McAdams on three other visits, and R. Scott Braithwaite on one of the visits. (*See* R. at 667-84.)

[8]  Dr. Bui diagnosed plaintiff with "benign hyp renal, no kid fail [403.10]," which in the diagnosis code reads as hypertensive renal disease without renal failure. (R. at 672);  National Center for Health Statistics (NCHS), http://www.cdc.gov/nchs/icd9.htm (last visited June 18, 2009).  Gastroenteritis refers to an inflammation of the stomach and intestinal tract that causes vomiting, diarrhea, or both. *Taber's Cyclopedic Medical Dictionary*, *supra* n.1, at 858.  Myalgia means tenderness or pain in the muscles, and myositis means inflammation of the muscle tissue. *Id.* at 1409, 1421.

headache but not severe." (R. at 657.)  In 2003, the laboratory result gave an impression of abdominal pain.  (R. at 764-66.)

Plaintiff visited Dr. Bui one time in 2004 and was diagnosed with neurasthenia and viral meningitis.[9]  (R. at 654.)  In his progress notes on the visit, Dr. Bui wrote that "overall she is doing pretty well."  (*Id.*)  Laboratory test results confirmed the diagnosis of viral meningitis.  (R. at 761-63, 843-45.)

In 2005, plaintiff made three visits to Dr. Bui's office with diagnoses, *inter alia*, of acute sinusitis, myalgia and myositis, and migraines .  (R. at 834-42.)  Additional diagnoses were trachea/bronchus disease, history of tobacco use, and dermatitis.  (R. at 837-42.)  Dr. Bui commented that plaintiff's pain was under control, especially her migraine headache, and that plaintiff was no longer seeing a psychiatrist, but still was taking medication. (R. at 837.)  In her last appointment with plaintiff on October 27, 2005, Dr. Bui wrote, "fibromyalgia[10] is probably her main issue. She is stable without deterioration in her physical condition for at least the past 3 years."  (R. at 835.)

On November 9, 2005, Dr. Bui completed a physical capacity evaluation of plaintiff, which included information from an occupational therapy capacity evaluation performed on November 4, 2005.  (R. at 885-92.)  Dr. Bui cited fibromyalgia and chronic headache as

---

[9]  Neurasthenia refers to a functional illness that involves symptoms such as chronic fatigue, anxiety, headache, and depression.  *Id.* at 1452. Viral meningitis is defined as an inflammation of the meninges as a result of infection by a virus.  *Id.* at 1338.

[10]  The Attorneys' Dictionary of Medicine defines fibromyalgia as "[o]ne of a group of nonarticular (not affecting joints) rheumatic diseases...characterized by dull and persistent pain, tenderness, and stiffness of (1) muscles, (2) regions where tendons are inserted into bones, and (3) nearby soft tissues."  2 J.E. Schmidt, M.D., *The Attorneys' Law Dictionary* F-81 (Matthew Bender & Co. 2008).

plaintiff's present diagnoses, with the related symptoms of pain in plaintiff's elbow, back, head, and neck.  (R. at 885.)  In the occupational therapy capacity evaluation, Dr. Bui opined that plaintiff could perform work in the sedentary category on a part-time basis and progress to full-time.  (R. at 889.)

### 2) *Dr. Cheryl Bernstein's Records*

Plaintiff testified that besides her primary care physician Dr. Bui, the other doctor she saw on a regular basis was her "pain care doctor," Cheryl Bernstein, M.D.  (R. at 919.)  The record contains the treatment record of  Dr. Bernstein from August 2002 to October 2005, at the UPMC Pain Evaluation and Treatment Institute (the "Institute").  (R. at 476, 855.)  The record contains the treatment records of Dawn A. Marcus, M.D., who had treated plaintiff at the Institute from November 16, 1999 to June 2002.  (R. at 269, 484.)  Plaintiff visited the Institute numerous times during the seven-year period from 1999 to 2005.  (R. at 260-71, 446-651, 855-84.)  Dr. Marcus and Dr. Bernstein treated plaintiff primarily for chronic daily headaches, nausea and vomiting, occasional migraines, fibromyalgia, endometriosis, insomnia, and pain in plaintiff's neck, shoulders, and lower back.  (*Id.*)  Prior to 2002, plaintiff also experienced anxiety and panic attacks.  (*Id.*)

On several occasions after 2000, the physicians reported that plaintiff's headaches were well controlled.  (R. at 560, 513, 453-54, 882.)  On May 18, 2004, Dr. Bernstein wrote that plaintiff "says she is overall doing well," and later noted that plaintiff's

> [c]hronic daily headaches, fibromyalgia, migraine headaches, and endometriosis [are] all well controlled on her long-acting opiate medication . . . .  Overall her functioning is improved and she has few side effects.  She would like to return to school, which she attributes to functioning overall on this medication.  She is

working fairly long hours, though, and is able to handle the increased work load without any difficulty.

(R. at 882-83.)  The number of plaintiff's visits to the Institute decreased over the years, with a

significant decrease occurring between 2002 and 2003.  (R. at 261-71, 447-651, 855-84.)  On a

scale of zero to ten, plaintiff's average pain during 2000 to 2001 was usually between a five and

a seven, whereas during 2003 to 2005, plaintiff's average pain was between a four and a five.  (R.

at 447-66, 516-651, 855-84.)  In the hearing before the ALJ, plaintiff testified that on a good day

her average pain would be a four.  (R. at 929.)

Dr. Marcus, starting in November 1999, originally treated plaintiff's headaches with

Oxycontin.  (R. at 261-71, 533-651.)  In July 2001, Dr. Marcus switched the plaintiff from

Oxycontin to MS Contin.  (R. at 521-38, 707.)  Dr. Marcus noted that plaintiff's medications

were well tolerated and that plaintiff was compliant with the medications.  (R. at 484-97, 509-

11.)  Plaintiff could function and work well on MS Contin, and that it did not have significant

side effects.[11]  (R. at 457, 463, 868.)

### 3) *Dr. Dilip Kar's Records*

On April 9, 2004, Dilip S. Kar, M.D., performed a residual functional capacity ("RFC")

assessment.  (R. at 800-08.)  In this evaluation, Dr. Kar found that plaintiff could frequently lift

and carry weights of twenty-five pounds; occasionally lift and carry weights of fifty pounds;

---

[11] A few sources in the record support the impression that plaintiff could be addicted to narcotics. (R. at 146, 159, 168-69, 248, 438, 492.)  In May 2002, treatment notes from the Institute reflected that plaintiff's pharmacist said plaintiff had "lied several times."  (R. at 492.)  The Butler Memorial Hospital records from January 2001 contain comments made by a physician that: "Patient seems to be in withdrawal.  I don't believe that the pain clinic prescribed her the Oxycontin!"  (R. at 438.)  Dr. Bui noted on October 7, 2003 that plaintiff was diagnosed with opiod dependence – contin."  (R. at 657.)

stand and walk for six of eight hours in a workday, and sit for six of eight hours.  (R. at 801.)  Dr.

Kar found no postural limitations, i.e., no limitations in climbing, stooping, kneeling, or

crawling.  (R. at 802.)

### 4) *Hospital Treatment*

Between November 1998 and January 2004, plaintiff was seen in a hospital almost thirty

times.  (R. at 159-64, 165-71, 173-75, 176-77, 185-93, 194-99, 200-06, 207-10, 211-14, 215-25,

226-30, 231-37, 238-43, 364-66, 367-71, 372-73, 374-77, 378-80, 381, 382-400, 402-13, 414-21,

422-26, 427-30, 431-34, 435-41, 442-45.)  About twenty of the hospital visits were due to

migraines, vomiting and nausea, kidney stones, and urinary tract infections.  Half of the visits

occurred before August 29, 2000.  (R. at 159-243, 364-445.)  Only four of the visits occurred

between 2002 and 2004.  (*Id.*)

### C. *Mental Health History*

### 1) *Psychiatric and other Medical Records*

February 28, 2000 was the last date plaintiff saw a psychiatrist, except for a few sporadic

evaluations taken to determine disability benefits.  (R. at 246-47, 312-18, 319-31, 809-23, 893-

96.)[12]  Dr. Marcus and Dr. Bernstein treated plaintiff on a few occasions for anxiety and panic

---

[12]   David Servan-Schreiber, M.D., a certified psychiatrist, saw plaintiff from September 4, 1998
until February 28, 2000.  (R. at 246-47, 256-59, 830.)  In his first visit with plaintiff in September
1998, Dr. Servan-Schreiber observed that plaintiff had been experiencing "frequent crying spells,
decreased appetite, difficult[y] falling asleep with sleep continuity disturbance and waking up
frequently in the middle of the night with a panic attack, marked anhedonia (defined as a "[l]ack
of pleasure in acts that are normally pleasurable;" *Taber's Cyclopedic Medical Dictionary*, *supra*
n., at 123),  feeling lost, hopeless, helpless, guilty, [and] ashamed with low self-esteem."  (R. at
256.)  He also noted plaintiff experienced panic attacks, agoraphobia (plaintiff said she was
"never leaving the house" to avoid more panic attacks), and suicidal thoughts.  (*Id.*)
Agoraphobia is the irrational fear of being in public places, especially crowded ones, or the fear
of being in a large open space.  2 Schmidt, *supra* note 21, at A-197.  Dr. Servan-Schreiber

attacks.  (R. at 260-71, 446-651, 855-84.)  Dr. Bui began treating plaintiff for depression in

November 2001, following plaintiff's break-up with her boyfriend and continued treating her for

depression through 2005.  (R. at 691-94, 834-42.)  On November 14, 2001, Dr. Bui started

prescribing Paxil, an antidepressant, and continued to prescribe antidepressants (either Paxil or

Celexa), through 2005.  (R. at 654-94, 834-42.)[13]  In October 2003, Dr. Bui noted that plaintiff's

mood <u>fluctuated</u> but was "overall stable."  (R. at 657-58.)  Dr. Bui prescribed Celexa "10 mg. for

a week or two then 20 mg."  (R. at 658.)  On May 18, 2004, Dr. Bernstein noted plaintiff was

taking Celexa for "depression/SAD."  (R. at 881.)

### *2) Dr. Glover's Report*

On April 14, 2004, Roger Glover, Ph.D., completed a psychiatric review form and opined

that plaintiff had mild restrictions in daily living activities, mild difficulties maintaining social

functioning, and mild difficulties in maintaining concentration, persistence, or pace, and

concluded that plaintiff's depression did not satisfy the requirements for finding a severe

affective disorder.  (R. at 809-23.)

---

diagnosed her with major depressive disorder and panic disorder with agoraphobia, and placed her on Effexor for her panic attacks and depression, as well as Ativan for her panic attacks.  (R. at 257-58.)  A month later, in October 1998, plaintiff still suffered from major depressive disorder and panic disorder with agoraphobia, having panic attacks multiple times a day.  (R. at 254.)  Plaintiff continued to have depression and panic attacks with agoraphobia while seeing Dr. Servan-Schreiber, although her panic attacks and anxiety improved while on Effexor.  (R. at 246-53.)

[13] Paxil may be used to treat major depressive disorder.  (R. at 693);  Physician's Desk Reference, *supra* note 27, at 1530.  Celexa also is an antidepressant.  <u>Id.</u> at 1164.

### 3) *Dr. Eisler's Report*

Robert L. Eisler, M.D., conducted a psychiatric evaluation on November 8, 2005.  (R. at 893-96.)  He described plaintiff as having "had anxiety with hyperventilation, . . . cold sweats, a fainting feeling," and a "panicky feeling that she is helpless and 'it's all hopeless.'"  (*Id.*)  He found she did not sleep well, made four suicide attempts, and felt worthless with her disability, and noted plaintiff as saying she would rather have terminal cancer.  (R. at 894.)  The evaluation also showed plaintiff had a poor or no ability to follow work rules, to deal with work stresses, to maintain concentration, to understand, to remember and to carry out simple job instructions, and to demonstrate reliability.  (R. at 895-96.)  He noted, however, plaintiff had a fair ability to understand, remember and carry out complex job instructions.  (R. at 895.)  Dr. Eisler concluded, "[t]he diagnosis is Major Depressive Disorder, Generalized Anxiety Disorder with Panic and Fibromyalgia and Migraine. This patient is quite unemployable in any job and almost certainly this problem will last a year or more."  (R. 894.)

### TESTIMONY BY PLAINTIFF AND VOCATIONAL EXPERT

### A. *Plaintiff's Testimony*

At the hearing before the ALJ on March 20, 2006,  the ALJ asked plaintiff what was currently bothering her, and plaintiff testified that she was currently suffering from headaches and fibromyalgia.  (R. at 918.)  She indicated that the pain associated with the fibromyalgia occurred in her knees and lower back, and sometimes in her shoulders, arms, and pressure points.  (R. at 928-29.)  She said her headaches occurred every day and all day, and when asked if she could work with her headaches, she said it depended on the job.  (R. at 938-39.)[14]  She testified

---

11

that being a sales associate would not be a job she could perform with her headaches.  (R. at 939.)

      When asked if there was anything else bothering her, plaintiff listed endometriosis along with "a history of kidney stones and urinary tract infections, asthma, and depression, anxiety, and panic attacks."  (R. at 919.)  Plaintiff said depression affected her in different ways, such as making her despondent, changing her energy level, as well as contributing to her stress and headaches.  (R. at 937.)  She said her panic attacks can induce fainting, vomiting, or thinking one is having a heart attack.  (*Id.*)  Plaintiff testified that she was currently taking fifteen milligrams of morphine sulfate instant release (MSIR) twice a day, MS Contin[15] at sixty milligrams twice a day, Flexeril [16] at 10 milligrams as needed, and Celexa[17] at forty milligrams once a day.  (R. at 921.)  Plaintiff testified that side effects from her medications include some nausea and tiredness.  (R. at 930.)  She said Flexeril makes her tired, so that she has to lay down at some point during the day.  (*Id.*)

---

[15]  The most common adverse effects of morphine (in both MS Contin and MSIR), like other opioid analgesics, include constipation, lightheadedness, dizziness, sedation, nausea, vomiting, sweating, dysphoria, and euphoria.  Thomson Healthcare, Inc., *Physician's Desk Reference* 2679 (62nd ed. 2008).  Major hazards from these medications include respiratory depression, apnea, and, to a lesser degree, circulatory depression, respiratory arrest, shock, and cardiac arrest.  (*Id.*)

[16]  Flexeril, a muscle relaxer, may have side effects such as chest pain, fast heartbeat, hallucinations, seizures, vomiting, and headaches.  Drug Digest, http://www.drugdigest.org (last visited June 22, 2009).

[17]  The proportion of patients experiencing adverse events from using Celexa, an antidepressant, cannot be meaningfully estimated unless divided into a table of standardized event categories.  (*See Id.* at 1164.)  In the table provided, which divides the percentage of patients on Celexa and reporting a particular event and the percentage of patients reporting the same events on a placebo, certain adverse events– those with a percentage difference of six percent or more– may be indicative of frequent adverse side effects.  (*See Id.* at 1164-65).  Those events with a six percent or more difference between the percentage of patients on Celexa and those on a placebo are dry mouth, nausea, and somnolence.  (*See Id.* at 1165.)

Plaintiff explained that she watched her best friend's two-year-old two days a week and every other weekend.  (R. at 934.)  She said the child arrives at six a.m. in the morning, and normally she and the child take a nap together right after the child arrives, for three and a half to four hours.  (R. at 934-35.)  They again take a nap together in the afternoon.  (R. at 935.)  The care plaintiff gives the child mostly consists of preparing easy meals for her and playing with her, but does not involve anything "too physical."  (R. at 935-36.)  Plaintiff testified that the care she gives her grandmother is mainly to make sure she takes her medication and also to make sure her grandmother does not get confused.  (R. at 936.)  Plaintiff testified that she occasionally helps out with housework and does her own washing.  (R. at 928.)  In her daily activities questionnaire, filled out in March 2004, plaintiff said she could use a vacuum cleaner, but could only do other "light" housework, such as dusting.  (R. at 126.)  Plaintiff testified that she could lift and carry weights of twenty pounds, but that she could not stand and walk six of eight hours in an eight-hour workday or sit for six of eight hours in a workday.  (R. at 931.)  She testified that she could stand and walk for six of eight hours for possibly one day, but that then she would "probably be in bed for the next two days."  (*Id.*)  When asked to explain why she believed she was disabled and could not work, plaintiff responded, "I do believe I can work somewhat, but I can't work full-time."  (*Id.*)  Later she testified that she could work part-time, or about fifteen to twenty hours per week.  (R. at 936.)

### B.  *Vocational Expert's Testimony*

The ALJ posed two hypothetical questions to the vocational expert (the "VE").  (R. at 942-43.)  The ALJ's first hypothetical question was:

> Doctor, I'd like you to assume an individual of the claimant's age, education, and
> past work experience; that the individual is capable of maximally lifting weights
> of 20 pounds, repetitively lifting weights of 10 pounds; standing and walking six
> of eight hours in a normal eight-hour workday; sitting six of eight hours in a
> normal eight-hour workday; and can occasionally climb, balance, stoop, kneel,
> crouch, or crawl. Could such an individual perform any of the claimant's past
> relevant work?

(R. at 942-43.)  In answer to this question, the VE testified that the individual could perform past

work as a sales associate and as a bartender.  The ALJ followed this question with a second

hypothetical question:

> Now, I'd like you to assume an individual of the claimant's age, education, and
> past work experience; that the individual can maximally lift weights of up to 10
> pounds, repetitively lift weights of less than 10 pounds; can stand and walk two of
> eight hours in a normal eight-hour workday; can sit six of eight hours in a normal
> eight-hour workday; and can occasionally climb, balance, stoop, kneel, crouch, or
> crawl. Could such an individual do any of the claimant's past relevant work?

(R. at 943.)   In answer to this question, the VE denied that the individual could do any of his or

her past work, but that the individual could perform the job of a clerk, an inspector or a checker,

or a packager.  (R. at 944.)

## LEGAL STANDARD

An administrative law judge's findings, subsequently adopted by the Commissioner, that

deny benefits to a claimant are subject to judicial review.  42 U.S.C.A. § 405(g).  This court must

determine whether the administrative law judge's findings of fact are supported by substantial

evidence.  Id.  Substantial evidence may be defined as somewhat less than a preponderance of

evidence, but more than a scintilla of evidence.  Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir.

1999).  If a "'reasonable mind might accept [such evidence] as adequate,'" it is substantial.

Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995) (quoting Richardson v. Perales, 402 U.S.

389, 401 (1971)).  Under this standard, this court cannot substitute its own conclusions for those

of the administrative law judge.  Burns v. Burnhart, 312 F.3d 113, 118 (3d Cir. 2002) (citing

Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992)).

### DISCUSSION

An individual is disabled under the SSA if she or he is unable "to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c (a)(3)(A);  42

U.S.C. § 423(d)(1)(A).  Substantial gainful activity includes not only an individual's previous

work, but any other kind of substantial work in the national economy, considering his age,

education, and work experience.  42 U.S.C. § 1382c (a)(3)(B);  42 U.S.C. § 423(d)(2)(A).

To evaluate whether a person is disabled, the SSA provides a five-step sequential test.  20

C.F.R. §§ 404.1520, 416.920.  If any of the steps are met, the individual will not be disabled.  *See*

20 C.F.R. §§ 404.1520, 416.920.  These five steps include: 1) whether the claimant presently

performs substantial gainful activity; 2) if not, whether the claimant has a severe impairment or

combination of impairments; 3) if so, whether the claimant's severe impairments meets the

criteria of an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1; 4) if not, whether the

claimant's RFC allows for the performance of claimant's past work; and 5) if not, whether,

considering the claimant's RFC, age, education, and work experience, the claimant can perform

any other work.  20 C.F.R. §§ 404.1520, 416.920.

Step one considers whether the claimant performs substantial gainful activity.  20 C.F.R.

§§ 404.1520(b), 416.920(b).  Congress defines substantial gainful activity as work activity

requiring significant physical or mental activities that are usually done for compensation.  20

C.F.R. § 404.1572(a-b) (2007).  If an individual does not perform substantial gainful activity,

then the analysis moves to step two.  In step two, the severity of an individual's impairment(s) is

evaluated.  20 C.F.R. §§ 404.1520(c), 416.920(c) (2007).   A severe impairment significantly

limits an individual's ability to do basic work activities.  *See* 20 C.F.R. 404.1521(a) (2007).  At

the third step, the adjudicator must decide whether the individual's impairment(s) meet any of the

standards for an impairment in 20 C.F.R. pt. 404, subpt. P, app. 1.  20 C.F.R. §§ 404.1520(d),

416.920(d) (2007).   If the individual's impairment does not equal a listed impairment, then a

residual functional capacity ("RFC") will be determined from the evidence in the record, and the

analysis will continue to the fourth step.  20 C.F.R. §§ 404.1520(e), 416.920(e).

At step four the judge determines whether the claimant has the RFC to perform past

relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  Past relevant work means work that the

individual learned to perform in the last fifteen years that was substantial gainful activity.  20

C.F.R. §§ 404.1560(b)(1), 416.960(b)(1).  The fifth and last step involves determining whether

the claimant can perform any other work considering her RFC, age, education, and work

experience.  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant has the burden of proof with

respect to the first four steps and the Commissioner has the burden of proof with respect to the

fifth step.  Sykes v. Apfel, 228 F.3d 259, 263 (3rd Cir. 2000).

With respect to the five steps, the ALJ found that 1) plaintiff had not engaged in

substantial work activity;[18] 2) plaintiff's headaches and fibromyalgia are severe, but her mental

---

[18]  The ALJ commented iwth respect to this step:  "I cannot tell if the claimant has been truthful
as to all of her work activities during the alleged period of disability, and I am unable to
characterize them as either substantial gainful activity or as unsuccessful work attempts."  (R. at

impairments, endometriosis and urinary tract/kidney infections are not severe; 3) plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1; 4) plaintiff can perform past relevant work and is able to perform light exertional work activities that involve no more than occasional crawling, crouching, kneeling, stooping, balancing or climbing.  (R. at 14-17.)  The ALJ did not reach the fifth step because plaintiff failed to met her burden with respect to the first four steps.

Plaintiff raises six main issues:

1.     Whether the ALJ erred in determining that plaintiff's endometriosis, urinary tract/kidney infections, depression, anxiety, and panic attacks were not severe impairments;

2.     Whether the ALJ erred in improperly disregarding the medical opinions of plaintiff's treating and examining physicians;

3.     Whether the ALJ erred in determining that plaintiff did not meet an impairment listed in Appendix 1, Subpart P, Regulations No. 4;

4.     Whether the ALJ erred in improperly determining plaintiff's RFC;

5.     Whether the ALJ erred in improperly disregarding the testimony of the vocational expert and relied on an incomplete hypothetical question; and

6.     Whether the ALJ improperly determined that plaintiff was able to return to her past relevant work as a sales associate.

Each of these issues will be addressed.

**I.  The ALJ erred in concluding that plaintiff's mental impairments were not severe impairments, but did not err in concluding that plaintiff's endometriosis, urinary tract/kidney infections were not severe impairments.**

Plaintiff argues that the ALJ erred in concluding that plaintiff's endometriosis, urinary tract/kidney infections, and mental impairments were not severe impairments.  For an

_____

14.)

impairment to be severe under step two, it must significantly limit an individual's ability to do basic work activities.  *See* 20 C.F.R. 404.1521(a).  In practice, courts have interpreted this provision liberally: "Although the regulatory language speaks in terms of 'severity,' the Commissioner has clarified that an applicant need only demonstrate something beyond 'a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work.'"  *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004);  *see Bowen v. Yuckert*, 482 U.S. 137, 149-51 (1987); *Salles v. Comm'r of Soc. Sec.*, 229 Fed. App'x 140, 144 (3d Cir. 2007).  In order to find an impairment, there must be supporting medical evidence for it, consisting of signs, symptoms, and laboratory findings.  20 C.F.R. § 404.1508.

### A.  __Endometriosis__

Plaintiff testified that her endometriosis and its associated symptom of menstrual pain are regulated with birth control medication, although the birth control medicine does not always curb her menstrual pain.  (R. at 938.)  She testified that every other month she has a "bad period" which means that she does not sleep for four days before it and has intense cramps.  (*Id.*)  After 2000, Dr. Bui only once reported plaintiff had menstrual pain.  (R. at 654-723, 834-42.)  In October 2005, Dr. Bui wrote that plaintiff's dysmenorrhea was better and that her condition was "stable without deterioration...for at least the past 3 years."  (R. at 834-35.)  Plaintiff argues that her endometriosis has been so severe that she has required visits to the hospital for it.  The visits plaintiff cites, however, all occurred prior to August 29, 2000.  (R. at 181-84, 187-93, 222-25, 231-37; *see* note at 2.)  Plaintiff received a discharge diagnosis of endometriosis from her single hospital visit in 2003, but she visited primarily for her headache pain and flu-like symptoms.

The reports from that visit generally concerned her suspected viral meningitis.  (R. at 382-400.) In 2004, Dr. Bernstein wrote that plaintiff's endometriosis was "well controlled" on medication. (R. at 882.)  The ALJ's conclusion that plaintiff's endometriosis is not severe is supported by substantial evidence in the record.  (R. at 15.)

**B. Urinary Tract/Kidney Infections**

The ALJ had substantial evidence to find that plaintiff's urinary tract infections and kidney stones were not severe impairments.  (R. at 15.)  In her testimony, plaintiff explained that she had a history of urinary tract infections and kidney stones.  (R. at 919.)  Plaintiff argues that she suffered severe pain from these conditions because she required treatment in the hospital for them on various occasions.  Only two of these hospital visits occurred after August 29, 2000, the date when plaintiff's original application for disability benefits was denied.  (R. at 159-71, 179-93, 200-06, 222-25, 231-37, 374-380.)  The two emergency room admissions after August 29, 2000 were in September 2000 and November 2000.  (R. at 374-80.)  A spiral CT scan in the September 2000 emergency room report reflected that plaintiff "was negative for any kidney stones or abnormalities."  (R. at 379.)  The November 2000 emergency room report similarly returned a negative urinalysis.  (R. at 374-77.)  Dr. Bui reported plaintiff had urinary tract infections two times in 2001.  (R. at 654-723; 834-42.)  In 2003, Dr. Bui remarked that plaintiff no longer had back pain from kidney stones, and in 2004 he noted an absence of urinary tract infection symptoms.  (R. at 654.)  The ALJ's conclusion that plaintiff's urinary tract infections and kidney stones were not severe is supported by substantial evidence in the record.

### C.  **Mental Impairments**

Substantial medical evidence, however, does not support the ALJ's finding that plaintiff's mental impairments were not severe.  (R. at 15.)  Plaintiff has a longitudinal record of treatment for depression and anxiety.  Plaintiff stopped seeing her psychiatrist, Dr. Servan-Schreiber, in February 2000.[19]  Dr. Marcus and Dr. Bernstein treated plaintiff on a few occasions for anxiety and panic attacks.  Dr. Bui began treating plaintiff for depression in November 2001, following plaintiff's break-up with her boyfriend and continued treating her for depression through 2005.  On November 14, 2001, Dr. Bui started prescribing Paxil, an antidepressant, and continued to prescribe antidepressants (either Paxil or Celexa), through 2005.  In October 2003, Dr. Bui noted that plaintiff's mood <u>fluctuated</u> but was "overall stable."  (R. at 657-58 (emphasis added).)  Dr. Bui prescribed Celexa "10 mg. for a week or two then 20 mg."  (R. at 658.)  On May 18, 2004, Dr. Bernstein noted plaintiff was taking Celexa for "depression/SAD."  (R. at 881.)  On November 8, 2005, Dr. Eisler characterized plaintiff's ability to behave in an emotionally stable manner as "<u>fair</u>" (R. at 896), but noted she had severe depression and anxiety.  (R. at 895.)  In making the determination that plaintiff's depression and anxiety and panic attacks were not severe the ALJ noted that her mental health limitations were mild, relying upon the report of Dr. Glover, the consultant, and rejecting the opinion of Dr. Eisler.  (R. at 15.)  The ALJ, however, did not refer to Dr. Bui's longitudinal diagnosis of depression or Dr. Bui's consistent treatment of plaintiff and prescribing medication for plaintiff's depression.

---

[19]  Evidence prior to August 29, 2000, when plaintiff was originally found not disabled, is irrelevant.  20 C.F.R. §§ 404.905, 404.987.

"The Third Circuit Court of Appeals has held that the step two inquiry is a 'de minimus screening device to dispose of groundless claims.'" *Velazquez v. Astrue*, Civ. No. 07-5343, 2008 U.S. Dist. LEXIS 81751, at *5 (E.D. Pa. Oct. 15, 2008) (quoting *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004)).  This court noted in *Wilson v. Astrue*, Civ. No. 08-0007, 2009 U.S. Dist. LEXIS 24326 (W.D. Pa. Mar. 24, 2009):

> The burden placed on an applicant at step two is not an exacting one. Although the regulatory language speaks in terms of "severity," the Commissioner has clarified that an applicant need only demonstrate something beyond "a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." *McCrea v. Comm'r of Soc. Security*, 370 F.3d 357, 360 (3d Cir. 2004) (citing SSR 85-28, 1985 SSR LEXIS 19, *7-8, 1985 WL 56856, at *3); *Newell*, 347 F.3d at 546 ("If the evidence presented by the claimant presents more than a 'slight abnormality,' the step-two requirement of 'severe' is met."). <u>Reasonable doubts about whether a "severity" showing has been made [are] to be resolved in favor of the claimant.</u> *Newell*, 347 F.3d at 547.

*Id.* at *39 (emphasis added).  Since the ALJ did not address plaintiff's longitudinal treatment for depression and anxiety or refer to her medical records for treatment of those conditions, the ALJ erred in concluding the depression and anxiety were not severe.  In *Velazquez* the court held:

> While the evidence may not establish disabling depression, the evidence also does not appear to establish that Velazquez's depression was groundless. As a result, on remand, the ALJ shall re-assess her determination regarding Velazquez's depression and support her decision with substantial evidence. Likewise, the ALJ shall conform her RFC assessment and any hypothetical questions to reflect her properly supported conclusions.

*Velazquez,* 2008 U.S. Dist. LEXIS, at **6-7.  Taken together, the evidence of record reflects plaintiff's mental impairments of depression and anxiety were not groundless; albeit, they may not be disabling limitations.  The ALJ here failed to address the longitudinal treatment of plaintiff's mental health conditions.  This case will need to be remanded for the ALJ to discuss

that evidence and explain why little weight was given to it in the step two analysis and the RFC assessment.

**II. The ALJ erred in improperly disregarding the medical opinions of two of plaintiff's treating and examining physicians.**

An administrative law judge should afford great deference to treating physicians' opinions, especially when those physicians' opinions "reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Morales v. Apfel*, 225 F.3d 310, 317-18 (3d Cir. 2000); *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *see* 20 C.F.R. 416.927(d)(2). The ALJ must give a reason when choosing to reject some evidence, and when a conflict arises in the evidence, the "ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" *Plummer*, 186 F.3d at 429 (quoting *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993)).

Plaintiff alleges that the ALJ improperly disregarded the medical opinion of plaintiff's treating and examining physicians. In the decision the ALJ did not make any reference to Dr. Bui, plaintiff's primary care physician,[20] although he did reference the records of Dr. Bernstein, plaintiff's pain treatment physician. (R. at 14-17.)

Plaintiff argues Dr. Bui's opinion's were improperly ignored, and highlights two reports from Dr. Bui with respect to plaintiff's condition which should have been further explained by the ALJ. The first report plaintiff acknowledged was a letter sent from Dr. Bui to the disability

---

[20]  The ALJ only indirectly cited evidence related to Dr. Bui when he stated, "evidence indicates her [plaintiff's] headaches are generally controlled with medication." (R. at 15; *compare* R. at 15, *with* R. at 707, 696, 837, 835 (indicating plaintiff's headaches are controlled).)

claims adjudicator on July 27, 2000, which predates the relevant period.  No error can be found for not addressing that report which predates the relevant time frame for this case.

The second report plaintiff uses to support her conclusion that the ALJ improperly disregarded Dr. Bui's opinion is a physical capacity evaluation filled out by Dr. Bui on November 9, 2005, which included an attached occupational therapy evaluation.  (R. at 885-92.) The attached occupational therapy evaluation, completed by a physical therapist, determined that plaintiff could perform work in the sedentary category "on a part-time basis and progress to full-time."[21]  (R. at 889.)   The ALJ concluded that plaintiff could perform work in the light work category, which is more difficult than sedentary work.  (R. at 15-17.);  *see* 20 C.F.R. § 404.1567. Dr. Bui preferred that the occupational therapy evaluation be completed by a physical therapist "because she [plaintiff] needs a detailed evaluation that I [Dr. Bui] could not do in the office." (R. at 835.)  Information from other medical sources –  i.e. physical therapists –  may be considered in order to "provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." *See* Social Security Ruling ("SSR") 06-03p.

Despite the therapist not being a treating physician, the therapist's opinion that plaintiff could do sedentary work does explain how the impairment affects plaintiff's ability to function. The ALJ should have explained why he rejected this evidence.  *Plummer*, 186 F.3d at 429.  This evidence contradicted the testimony of the VE in response to the first hypothetical question, in which the VE testified the individual could perform light, semi-skilled work as a sales associate, but was consistent with the response to the second hypothetical question, in which the VE

---

[21]  Although a physical therapist completed the occupational therapy evaluation, and not Dr. Bui herself, the fact that Dr. Bui attached the form to plaintiff's physical capacity evaluation implicates she credited that evaluation.  (*See* R. at 885-92.)

testified an individual could perform sedentary work.  (R. at 942-44.**)**  Because some of the evidence is in conflict, the ALJ needs to explain why he choose one source over another.  *See Plummer*, 186 F.3d at 429 (quoting *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993)).

The ALJ did not explain why he rejected the consultative evaluation by examining physician Dr. Eisler (Exhibit 30F), although he did sufficiently explain his dismissal of evidence provided by Dr. Sargent (Exhibit 10F) and Dr. Uran (Exhibit 11F).[22]  (R. at 15-16.)  The ALJ, in explaining his conclusion that plaintiff's mental impairments were not severe, agreed with state agency consultant Roger Glover, Ph.D., and disagreed with Robert Eisler, M.D.  (R. at 15.)  Dr. Eisler, in his 2005 evaluation, diagnosed plaintiff with two mental impairments: major depressive disorder and generalized anxiety disorder with panic.  (R. at 894.)  On April 14, 2004, Dr. Glover found plaintiff's alleged mental impairments to be mild, not severe, and indicated that plaintiff's depression did not satisfy the requirements for finding a severe affective disorder.  (R. at 809-23.)  In dismissing Dr. Eisler's opinion, the ALJ commented, "I disagree with the opinion of R. Eisler at Exhibit 30F."  (*Id.*)  While the ALJ has authority to choose between medical opinions,  he must explain the rationale behind the choice.  *See Plummer*, 186 F.3d at 429.  The ALJ's dismissal of Dr. Eisler's findings constituted error because no reason was offered for rejecting them.  *Plummer*, 186 F.3d at 429.[23]  The rejection is troubling in light of Dr. Bui's longitudinal treatment of plaintiff for depression.  The ALJ erred in failing to discuss and to

---

[22]  The records from Dr. Sargent and Dr. Uran treated plaintiff prior to her original disability denial in August 2000.  (R. at 308-18.)

[23]  Dr. Eisler, in his 2005 evaluation,  wrote that "plaintiff is quite unemployable in any job and almost certainly this problem will last a year or more."  (R. at 894.) This statement may be considered a conclusory statement, similar to the statement "unable to work," which does not need to be followed by an administrative law judge.  *See* 20 C.F.R. § 404. 1527(e)(1);  20 C.F.R. 416.927(e)(1).

present reasons for discounting the opinions of Dr. Bui and Dr. Eisler.  *See Morales*, 225 F.3d at 317-18;  *Plummer*, 186 F.3d at 429.

### III.  The ALJ had substantial evidence to support his conclusion that plaintiff did not meet an impairment listed in Appendix 1, Subpart P, Regulations No. 4.

There is substantial evidence for the ALJ's finding that plaintiff did not meet or equal a listing under 20 C.F.R. § 404, subpt. P, app. 1.  Plaintiff argues that the ALJ did not analyze the medical evidence or explain why plaintiff did not meet any of the listings.

An administrative law judge's decision must be considered as a whole in determining whether the administrative law judge adequately considered the factors necessary for the relevant listings.  *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004).  In 2000, the court in *Burnett v. Commissioner of Social Security*, determined that an administrative law judge should provide reasons for finding that a plaintiff did not meet the listings under step three, holding that the administrative law judge's bare conclusory statement –  i.e., that plaintiff did not meet the listings – was insufficient.  220 F.3d 112, 119 (3d Cir. 2000).  In *Jones* the court of appeals , considering a similar challenge to an administrative law judge's conclusory statement made with respect to the listings, found, in distinction from *Burnett*, that the administrative law judge had analyzed and explained enough facts in the record to support the statement.  364 F.3d at 505.

Here, considering the decision as a whole the ALJ provided sufficient explanation to support his finding that plaintiff did not meet or equal any of the listings.  20 C.F.R. § 404, subpt. P, app. 1 (2007).  The listings appear inapposite to plaintiff's chronic headaches and fibromyalgia.  § 404, subpt. P, app. 1.  The closest listing related to plaintiff's headaches may be

Listing 11.18, cerebral trauma, but this does not equal plaintiff's chronic headaches.[24]  The ALJ's

discussion about plaintiff's headaches, relying on evidence from one of plaintiff's treating

physicians, Dr. Bernstein, indicated that they are controlled with medication.  (R. at 15-17.)

Plaintiff's fibromyalgia similarly does not meet a listing.  The closest listing to fibromyalgia may

be Listing 1.02, major dysfunction of a joint(s) (due to any cause).[25]  The ALJ noted that "the

requisite trigger points for fibromyalgia are not conclusively established in the evidentiary record

at this time."  (R. at 15.)  He commented that when plaintiff was diagnosed with fibromyalgia in

2004, her physical examination was normal and no prior examinations of plaintiff found any

trigger points.  (R. at 17.)

      Plaintiff argues that she may meet either Listing 12.04, affective disorder, or 12.06, an

anxiety-related disorder.  Listing 12.04 concerns a disturbance of mood accompanied by a full or

partial manic or depressive syndrome.[26]  Listing 12.06 concerns manifestations of anxiety, such

---

[24]  Listing 11.18 directs the reader to evaluate provisions 11.02, 11.03, 11.04, and 12.02, as applicable.  20 C.F.R. § 404, subpt. P, app. 1 § 11.18.  Listings 11.02 and 11.03 concern epilepsy, which is not the case here.  *See Id.* §§ 11.02, 11.03.  Listing 11.04 requires a central nervous system vascular accident that results in either ineffective speech or a significant effect of motor function in two extremities, which also does not apply here.  *Id.* at § 12.04.  Listing 12.02 concerns organic mental disorders, or psychological or behavioral abnormalities associated with a dysfunction of the brain.  *Id.* at § 12.02.  Listing 12.02, even though perhaps the closest listing to chronic headaches, still does not seem to equal the impairment of chronic headaches, but rather seems to relate more to plaintiff's mental impairments.  *See Id.* § 12.02.  Plaintiff does not argue that she meets this listing, so any analysis of those factors is not necessary here.

[25]  Listing 1.02 requires either that one cannot ambulate (i.e. walk and perform daily living activities) effectively, or one cannot perform fine and gross movements effectively, meaning that one's upper extremities must be able to perform activities of daily living, such as pulling, pushing, grasping, etc.  20 C.F.R. § 404, subpt. P, app. 1 § 1.02.  There is no evidence that plaintiff's fibromyalgia meets this listing.

[26]  Listing 12.04 is satisfied by meeting the requirements in both A and B, or meeting the requirements in provision C.  20 C.F.R. § 404, subpt. P, app. 1 § 12.04.  Provision A(1) requires evidence of the persistence of four of its elements, which include disturbances such as a

as a persistent irrational fear of a specific object, activity, or situation; recurrent severe panic attacks; or recurrent obsessions or compulsions.[27]   Viewing the ALJ's opinion as a whole, *Jones*, 364 F.3d at 505, in particular the ALJ's agreement with Dr. Glover that plaintiff's mental limitations were "mild" in nature, the court concludes that the ALJ adequately explained his conclusion that plaintiff did not meet either of the above mental impairment listings.  (R. at 15.)

**IV.  Error in determining plaintiff's RFC.**

The determination of plaintiff 's RFC is inextricably intertwined with the issue raised with respect to the severity of her mental conditions and the weight to be given to Dr. Bui's opinions and longitudinal treatment of plaintiff.  The RFC determination must be supported by substantial evidence from the record.  *Burnett v. Comm'r of Social Security*, 220 F.3d 112, 118 (3d Cir. 2000).  Until the ALJ explains why plaintiff's mental conditions are not severe in light of Dr. Bui's longitudinal treatment of plaintiff and provides reasons for rejecting Dr. Bui's diagnoses and opinions, the court is unable to determine whether the ALJ's RFC determination is supported by substantial evidence.  A remand will be necessary for the ALJ to reassess the RFC

---

pervasive loss of interest in almost all activities, sleep disturbance, psychomotor agitation or retardation, decreased energy, thoughts of suicide, etc.  *See id.* at § 12.04.  Provision A may also be met by a finding of bipolar syndrome.  *See id.* at § 12.04(A).  Provision B requires that the impairments listed under part A result in two of the following: 1) marked restriction of activities of daily living; or 2) marked difficulties in maintaining social functioning; or 3) marked difficulties in maintaining concentration, persistence, or pace; or 4) repeated episodes of decompensation, each of extended duration.  *Id.* at § 12.04(B).  Provision C requires a history of chronic affective disorder that has caused more than a minimal limitation of ability to do basic work activities, along with one additional factor.  *Id.* at § 12.04(C).

[27]   One of these persistent anxieties must either result in a complete inability to function outside one's home, or result in marked difficulties in two of the following: 1) marked restriction of activities of daily living; or 2) marked difficulties in maintaining social functioning; or 3) marked difficulties in maintaining concentration, persistence, or pace; or 4) repeated episodes of decompensation, each of extended duration.  20 C.F.R. § 12.06, subpt. P, app. 1 § 12.06.

determination.

**V.  Error in incomplete hypothetical question.**

An administrative law judge's questions to a vocational expert must present plaintiff's limitations which are credibly and medically established in the record.  *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir.  2005.)  In this case without an explanation of why Dr. Bui's longitudinal treatment of plaintiff and Dr. Bui's opinions were rejected, the court cannot assess whether the hypothetical included all credible and medically established limitations.  This issue will need to be reassessed on remand by the ALJ.

**VI.  Error in determining that plaintiff was able to return to her past work as a sales associate.**

Plaintiff argues that the ALJ improperly determined that plaintiff could return to her past work as a sales associate.  This court is not able to assess this issue due to the need for a remand for the ALJ to explain why Dr. Bui's longitudinal treatment and opinions were rejected.  The ALJ will need to reassess this issue on remand.

**CONCLUSION**

For the reasons discussed above, this case will need to be remanded to the ALJ for further proceedings consistent with this opinion.

By the court,


/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge

Date: September 17, 2009

28
